# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF NEW MEXICO

HOT SPRINGS LAND DEVELOPMENT, LLC,
a New Mexico Limited Liability Company, and
HOT SPRINGS MOTORPLEX DEVELOPMENT, LLC,
a New Mexico Limited Liability Company,

    Plaintiffs,

v.               CV 13-0736 WPL/LAM

CITY OF TRUTH OR CONSEQUENCES,
a New Mexico Municipality,

    Defendant.

## MEMORANDUM OPINION AND ORDER

This matter is before me on the Motion for Dismissal of All Claims Based Upon Lack of Subject Matter Jurisdiction filed by Defendant City of Truth or Consequences ("City" or "the City"). (Doc. 25.) Plaintiffs have filed a response brief in opposition to the motion (Doc. 33), and the City has filed a reply (Doc. 37). Having considered the pleadings, the filings, and the relevant law, and being otherwise fully advised in the matter, I conclude that subject-matter jurisdiction does not exist over Plaintiffs' claims. Thus, the City's motion is GRANTED, and Plaintiffs may file an amended complaint curing the defects identified herein within fourteen days of the filing of this document.

## FACTUAL AND PROCEDURAL POSTURE[1]

The City, located in Sierra County, New Mexico, has found itself the subject of increased tourism and development interest in recent years. Hot Springs Land Development, LLC, along

---

[1] Because I consider the instant motion as a facial attack on jurisdiction, all quoted language and factual allegations discussed here are taken from Plaintiffs' complaint and are accepted as true for present purposes. *Holt v. United States*, 46 F.3d 1000, 1002 (10th Cir. 1995) (citation omitted).

with its management and development company Hot Springs Motorplex Development, LLC, are New Mexico-based limited liability companies who, in light of this interest, began pursuing plans to develop and improve the Truth or Consequences Municipal Airport ("the Airport") and the surrounding land. In April 2007, Plaintiffs and the City signed a Letter of Intent setting forth terms under which the parties would enter into an exclusive operating and development agreement.

On August 17, 2007, the parties entered into two pertinent agreements. The first, an Airport Development Agreement ("ADA"), granted exclusive commercial development rights of the Airport to Plaintiffs. The second, an Option Agreement for Purchase and Sale of Rights ("Option Agreement"), granted Plaintiffs an exclusive option to purchase the rights to significant percentages of the City's current and planned future water and sewer capacity in exchange for $200,000 in deposits. At the time that the parties entered into these agreements, the City was aware that Plaintiffs intended to purchase over 7,000 acres of land surrounding the Airport ("the Property"), including sections of land not within the City's limits, for the purpose of developing that land pursuant to the ADA.

Eleven days later, the City Commission passed Airport Impact Overlay District Ordinance No. 574, which Plaintiffs characterize as imposing "unreasonable height, density, and noise restrictions" on the land that they intended to develop. Though Plaintiffs do not specify what these restrictions were, they assert that Ordinance No. 574 had the effect of "intentionally and maliciously restrict[ing] Plaintiffs of all beneficial use of its future property" and that the Ordinance "rendered the ADA and related agreements impossible to perform."

Nevertheless, Plaintiffs continued to pursue their development goals. They purchased and closed on the Property in April 2008 and filed for annexation of the Property into the City the

next month, relying on numerous prior representations from the City that it would provide municipal services to Plaintiffs' development. Meanwhile, Plaintiffs developed a package on the development, including a "Master Plan Concept," for submission to the City. The City and its Commission approved the annexation in August 2008 "based on Plaintiffs' specified uses and Plaintiffs' Master Plan Concept."

Despite this progress, matters soon went south again. On September 24, 2008, the City's mayor, clerk, and attorney signed a Termination of Airport Development Agreement ("ADA Termination"), representing to Plaintiffs that such action was necessary because "it was required by law for the [Federal Aviation Administration ("FAA")] to approve the ADA and that the FAA had refused or failed to approve the ADA." Though Plaintiffs now contend that any termination was legally and contractually improper, their representative signed the ADA Termination based on the City's statements regarding FAA approval.

As Plaintiffs describe it, the City continued to chip away at their property interests and development plans over the following years. In October 2010, a City Commissioner drafted language in an agreement reached between Sierra County and the nearby Spaceport America that precluded the Property from any commercial opportunities with Spaceport America. In July 2011, the City refused to lease Airport land identified as the North Parcel to Plaintiffs unless they placed money in escrow for twelve months "to cover potential FAA Grant-in-Aid funding losses." The City also represented at that time that the FAA had demanded the sale of a portion of the Property to the City in order to allow Plaintiffs to develop the Airport, and the City threatened to seize that portion via eminent domain if Plaintiffs refused to sell it. On the other hand, the City promised that the North Parcel lease would be completed within three weeks if Plaintiffs sold the contested land to it. Based on these statements, Plaintiffs sold the portion of

land in question for its approximate acquisition cost, but the North Parcel lease was not completed thereafter.

Throughout this process, Plaintiffs continued unsuccessfully to seek infrastructure and utility support for their Property. The parties entered into a water well agreement on September 9, 2008, under which "the City encouraged Plaintiffs to use Plaintiffs['] own funds to develop a water well"; if the Plaintiffs finished a well test site and established an exploratory production water well, the City agreed that it would deliver the water to Plaintiffs' development. Though Plaintiffs completed the well test site, the City abandoned the project only nineteen days after entering into the agreement and refused to deliver water from the proposed well to the development. The City compensated Plaintiffs for the purported breach, though Plaintiffs contend that they spent much more money in performing the agreement than was returned to them. Over the years, the City continued to refuse to meet with Plaintiffs to discuss their utility needs and ignored formal requests for those services. Plaintiffs' attempt in August 2011 to exercise their option to buy water rights using the initial $200,000 Option Agreement deposit was denied by the City that month.

The relationship between Plaintiffs and the City remained rocky in the ensuing months. In January 2012, the City sent detailed information to the FAA about a Travel Center proposed by Plaintiffs in an attempt to obtain the FAA's "pre-emptive disapproval of the project." Six months later, and at multiple times thereafter, the City requested that Plaintiffs sign a waiver and release for any causes of action Plaintiffs may have against the City and for their $200,000 Option Agreement deposit, all as a condition precedent to completing the North Parcel lease. Though Plaintiffs continually refused to sign any such release, the City indicated that it was still willing to work with Plaintiffs to move forward with the lease and development plans.

Nonetheless, Plaintiffs requested invalidation of the 2008 annexation and the reimbursement of impact fees. The City denied that request in August 2012.

January 2013 proved to be critical in two respects. First, the City Commission repealed Ordinance No. 574 and replaced it with Ordinance No. 633, which imposed a 45-foot height limitation on structures built in the Airport overlay district. Plaintiffs also assert that the City intends to impose noise and density restrictions that would require them to apply for special-use permits before proceeding with their development plans. Though Ordinance No. 633 purports to enact FAA restrictions, Plaintiffs believe that the Ordinance is more restrictive than the FAA's requirements, and they further believe that the same would be true of any special-use permitting process. Second, in anticipation of a City Commission meeting and an Executive Session, the City released a Briefing Packet to the public that contained several documents, including a "Release" authored by the City, a version of a contemplated commercial lease, and a letter from Plaintiffs to the city manager itemizing deposits, loans, and expenses. At a January 30, 2013[2] Executive Session, the City Commission voted unanimously to enforce the Release and to refuse to sign the lease unless Plaintiffs signed the Release.

Plaintiffs filed the complaint in this action in August 2013, seeking declaratory and injunctive relief, alleging unconstitutional regulatory takings, and bringing numerous state-law claims. Not long after filing its First Amended Answer, the City filed the instant motion asserting that Plaintiffs' federal claims are not justiciable and that I should either dismiss the state-law claims or grant it judgment on the pleadings as to those claims.

---

[2] I assume from context that Plaintiffs' reference to a "January 30, 2012" Executive Session (*see* Doc. 1 at 18) is a typo.

S<span style="font-variant:small-caps">TANDARD OF</span> R<span style="font-variant:small-caps">EVIEW</span>

Federal Rule of Civil Procedure 12(b)(1) permits a party to move for dismissal of claims for lack of subject-matter jurisdiction. A court may consider such challenges to jurisdiction at any time. *See* F<span style="font-variant:small-caps">ED</span>. R. C<span style="font-variant:small-caps">IV</span>. P. 12(h)(3). "The burden of establishing subject matter jurisdiction is on the party asserting jurisdiction." *Port City Props. v. Union Pac. R.R. Co.*, 518 F.3d 1186, 1189 (10th Cir. 2008) (citation omitted).

Challenges to subject-matter jurisdiction come in two flavors. A "facial attack" on subject-matter jurisdiction challenges the sufficiency of the complaint, with all allegations in the complaint accepted as true. *Holt v. United States*, 46 F.3d 1000, 1002 (10th Cir. 1995) (citation omitted). By contrast, a "factual attack" on jurisdiction goes beyond the allegations of the complaint, challenging the alleged facts upon which subject-matter jurisdiction depends. *Id.* at 1003 (citation omitted). Although a facial attack may not rely on documentary and testimonial evidence, such evidence may be used to support a factual attack on subject-matter jurisdiction. *See Paper, Allied-Indus., Chem. & Energy Workers Int'l Union v. Cont'l Carbon Co.*, 428 F.3d 1285, 1292-93 (10th Cir. 2005). However, when the resolution of jurisdictional facts is intertwined with the merits of the underlying case, a court must convert the Rule 12(b)(1) motion to a Rule 12(b)(6) motion to dismiss for failure to state a claim or a motion for summary judgment. *See Holt*, 46 F.3d at 1003.

Here, while acknowledging that it disputes many of Plaintiffs' claims, the City argues in its motion that its subject-matter-jurisdiction attack is "based upon Plaintiffs' allegations in the Complaint." Indeed, the instant motion consistently frames itself as attacking the sufficiency of the complaint, was filed with no exhibits attached, and makes no reference to evidence outside of the pleadings. However, although citing at all times to Plaintiffs' complaint, the motion contains

statements and inferences that Plaintiffs contend are inconsistent with their factual allegations. When Plaintiffs raised this point in their response, the City filed a reply with an attached affidavit from the City's assistant city manager and suggested that I could consider the matter as either a facial attack or a factual attack.

Because the City failed in the first instance to challenge the factual bases upon which Plaintiffs' claims of jurisdiction depend, it has waived for now its factual attack. *See United States v. Harrell*, 642 F.3d 907, 918 (10th Cir. 2011) ("[A]rguments raised for the first time in a reply brief are generally deemed waived." (citation omitted)). Since the parties have only fully briefed the City's facial attack on jurisdiction, I will limit the reach of this Order to that attack.

DISCUSSION

Plaintiffs raise three claims that expressly invoke the original jurisdiction of this Court. In Counts I and II, Plaintiffs ask for a declaration that Ordinance No. 633 and related matters are preempted by federal law and an injunction prohibiting the City from enforcing such purportedly preempted local laws against them. In Count III, Plaintiffs argue that the City's actions against them and their Property constitute an unconstitutional regulatory taking. The remaining seven claims arise under state law.

### I.      Declaratory Judgment as to Ordinance No. 633

In Count I, Plaintiffs seek a declaratory judgment stating that Ordinance No. 633 and its related special-use permitting processes are preempted by federal law and regulations, that this Ordinance and the permitting process are therefore invalid and unenforceable against them, and that the City intentionally and wrongfully deprived them of their property rights. The City argues that Plaintiffs have not alleged that it has taken action against them under this Ordinance or permitting process and that any declaratory judgment on this question would be unripe and

would constitute an advisory opinion. Plaintiffs counter that a present controversy exists because the Ordinance "is in conflict with their heavily publicized and agreed upon development plans . . . and is also preempted by federal law," and they assert that a declaratory judgment in their favor would "clarify the legal impact of the City's ordinance."

A. Legal Standards

Because Article III of the Constitution only allows federal courts to adjudicate actual cases and controversies, questions regarding the justiciability of a claim bear directly on a court's subject-matter jurisdiction. *See United States v. Wilson*, 244 F.3d 1208, 1213 (10th Cir. 2001); *see also* U.S. CONST. art. III, § 2. A justiciable controversy is one that is "definite and concrete, touching the legal relations of parties having adverse legal interests," is "real and substantial," and is "admi[tting] of specific relief through a decree of a conclusive character, as distinguished from an opinion advising what the law would be upon a hypothetical state of facts." *MedImmune, Inc. v. Genentech, Inc.*, 549 U.S. 118, 127 (2007) (quoting *Aetna Life Ins. Co. v. Haworth*, 300 U.S. 227, 240-41 (1937)) (discussing justiciability with respect to the Declaratory Judgment Act).

In particular, when considering whether a controversy is ripe for adjudication, the reviewing court must evaluate both "the fitness of the issues for judicial decision" and "the hardship to the parties of withholding court consideration." *Farrell-Cooper Mining Co. v. U.S. Dep't of the Interior*, 728 F.3d 1229, 1234 (10th Cir. 2013) (quoting *Abbott Labs. v. Gardner*, 387 U.S. 136, 149 (1967)). "In evaluating ripeness the central focus is on whether the case involves uncertain or contingent future events that may not occur as anticipated, or indeed may not occur at all." *Initiative & Referendum Inst. v. Walker*, 450 F.3d 1082, 1089 (10th Cir. 2006) (en banc) (internal quotation marks omitted).

The Declaratory Judgment Act, 28 U.S.C. § 2201, reads in pertinent part:

In a case of actual controversy within its jurisdiction . . . any court of the United States, upon the filing of an appropriate pleading, may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought.

28 U.S.C. § 2201(a). The statute plainly "does not itself confer jurisdiction on a federal court where none otherwise exists"; it only provides an avenue of relief once a basis for federal jurisdiction over an "actual controversy" is established. *Amalgamated Sugar Co. v. Bergland*, 664 F.2d 818, 822 (10th Cir. 1981). "[T]he phrase 'case of actual controversy' in the [Declaratory Judgment] Act refers to the type of 'Cases' and 'Controversies' that are justiciable under Article III." *MedImmune,* 549 U.S. at 126-27 (citing *Aetna Life Ins. Co.*, 300 U.S. at 240).

When a party invokes the Declaratory Judgment Act, the basic question "in each case is whether the facts alleged, under all the circumstances, show that there is a substantial controversy, between parties having adverse legal interests, of sufficient immediacy and reality to warrant the issuance of a declaratory judgment." *Id.* at 127 (quoting *Md. Casualty Co. v. Pac. Coal & Oil Co.*, 312 U.S. 270, 273 (1941)). These parameters, though helpful, "do not draw the brightest of lines," *see id.*, and courts considering claims that seek declaratory relief often struggle with "the difficult task of distinguishing 'between actual controversies and attempts to obtain advisory opinions on the basis of hypothetical controversies,'" *Rio Grande Silvery Minnow v. Bureau of Reclamation*, 601 F.3d 1096, 1111 n.12 (10th Cir. 2010) (quotation omitted).

Several years ago, when faced with such a struggle, the Tenth Circuit helpfully engaged in a detailed review of Supreme Court decisions examining the breadth and limits of declaratory-judgment justiciability. *See Columbian Fin. Corp. v. BancInsure, Inc.*, 650 F.3d 1372, 1377-82 (10th Cir. 2011). As the court recognized, the key question in many cases is whether the issue in

question is "presented in the context of a specific live grievance," *see id.* at 1378 (quoting *Golden v. Zwickler*, 394 U.S. 103, 110 (1969))—that is, whether the issue "arises in a specific dispute having real-world consequences," *id.* at 1379. So, for example, when a bank feared that its membership in the Federal Reserve System might be threatened because a particular private company owned a few shares of the bank's stock, in apparent violation of the System's membership requirements, the Court found that the bank's action challenging those requirements was unripe because the Federal Reserve Board had "disavow[ed] any action to terminate the Bank's membership" under the circumstances. *See id.* at 1379-80 (quoting *Eccles v. Peoples Bank*, 333 U.S. 426, 432 (1948)). Similarly, when the owner of a patent sought a declaration that a statute was unconstitutional insofar as it required a licensee to pay excessive royalties from government purchases to the U.S. Treasury rather than to the patent owner, the Supreme Court found the action to be unripe, noting that the owner had not sought recovery of the excessive royalties and that the licensee had not subsequently relied on the statute as a defense. *Id.* at 1379 (citing *Coffman v. Breeze Corps., Inc.*, 323 U.S. 316 (1945)).

In both cases, as well as in others cited in *Columbian Financial Corp.*, the "concurrence of . . . contingent events, necessary for injury to be realized, [wa]s too speculative to warrant anticipatory judicial determinations." *See id.* at 1380 (quoting *Eccles*, 333 U.S. at 432). By contrast, when a patent licensee sought a declaratory judgment that the patent was unenforceable, the controversy was deemed ripe notwithstanding the fact that the patent owner was unlikely to sue the licensee as long as the latter continued to make royalty payments. *See id.* at 1377 (citing *MedImmune*, 549 U.S. at 121-25). In that case, rather than any injury being contingent on future conduct, the licensee's continuing royalty payments were effectively "coerced" by the threat of liability for treble damages if it stopped paying royalties and the patent was later upheld. *See id.*

10

(citing *MedImmune*, 549 U.S. at 129-36). "The dilemma posed by that coercion—putting the challenger to the choice between abandoning his rights or risking prosecution—is 'a dilemma that it was the very purpose of the Declaratory Judgment Act to ameliorate.'" *MedImmune*, 549 U.S. at 129 (quoting *Abbott Labs.*, 387 U.S. at 152).

The City points to two additional cases that it believes are relevant. First, in *Norvell v. Sangre de Cristo Dev. Co., Inc.*, the State of New Mexico brought a declaratory action seeking to establish that it held jurisdiction under certain statutes over a company leasing Indian land for residential development. *See* 519 F.2d 370, 371-72 (10th Cir. 1975). Though the district court granted judgment in the State's favor, the Tenth Circuit reversed on the ground that the trial court lacked jurisdiction for want of a case or controversy. *Id.* at 375-79. Noting that a recent circuit court decision on compliance with environmental regulations meant that development had been halted at the time of trial and judgment, the Tenth Circuit observed that

> we do not know whether the development project shall go forward or, if ultimately authorized . . ., the precise activities which may be permitted on the leased lands. . . . The State can do no more than presently allege that if the project is approved and developed, it may fall within the statutory ambits. Such is insufficient to meet the case or controversy tests.

*Id.* at 376 (citing, *e.g.*, *Toilet Goods Ass'n, Inc. v. Gardner*, 387 U.S. 158 (1967)).

Second, in *Bateman v. City of West Bountiful*, a city resident was effectively unable to refinance or sell his property due to a finding that his structural improvements were not in compliance with local zoning requirements, so he brought a takings claim against the city. *See* 89 F.3d 704, 705-06 (10th Cir. 1996). The Tenth Circuit reviewed the pertinent Utah zoning statutes before concluding that the case was not ripe for adjudication since finality was lacking, noting that the resident had failed to seek review and a possible variance under state law and that the city had taken no affirmative enforcement action against him. *Id.* at 706-07; *see also Williamson*

*Cnty. Reg'l Planning Comm'n v. Hamilton Bank*, 473 U.S. 172, 186-87 (1985) (holding that a regulatory takings claim is not ripe "until the government entity charged with implementing the regulations has reached a final decision regarding the application of the regulations to the property at issue").

    B.  <u>Application</u>

    Here, Plaintiffs state that an actual controversy exists and that this matter is ripe for review. They argue in particular that their development plans are "heavily publicized and agreed upon," that the City has already enacted Ordinance No. 633, and that they therefore face "'a realistic danger of sustaining a direct injury as a result of the [Ordinance]'s operation or enforcement.'" (Doc. 33 at 10 (quotation omitted).) The City counters that this action does not present a ripe controversy since Plaintiffs do not allege that it has taken any action against them under Ordinance No. 633 or that their plat plan for the development has even been filed, much less rejected under the Ordinance. It cites *Norvell* for the proposition that any opinion at this stage would be advisory, and it cites *Bateman*, a takings case, by analogy to assert that Plaintiffs have failed to show the requisite finality to establish ripeness.

    A review of New Mexico law and City ordinances shows some similarities between the applicable zoning procedures here and those considered in *Bateman*. State law allows municipalities to regulate zoning within their boundaries through planning commissions and zoning authorities. *See* N.M. STAT. ANN. §§ 3-21-1, -2(B), -7. Pursuant to the City Code of Ordinances,[3] subdividers of land within the City must file a master plan in certain circumstances, and they may choose to submit a conceptual plan of the development. *See* Code of Ordinances, City of Truth or Consequences, New Mexico ("City Code") §§ 15-12(A), (B)(1), -13(B).

---

[3] As of this writing, the official City Code of Ordinances can be accessed at the City's website, http://www.torcnm.org/municipal_code.html.

However, whether or not a master plan is required or a conceptual plan is submitted, the City Code states that submission and approval of a preliminary plat is "required for *all* subdivisions" unless alternative processes are pursued. *See id.* § 15-13(A) (emphasis added). At or prior to the time that a preliminary plat application is filed, the subdivider may submit a request for a variance if, *inter alia*, "strict compliance with this Code would result in inhibiting the achievement of [its] objectives." *See id.* § 15-9(A), (C).

After initial reporting from applicable City departments and other parties, and after the City Zoning Administrator determines that the preliminary plat application meets City Code requirements, *see id.* § 15-13(D), the City Planning and Zoning Commission reviews the application and determines whether or not to recommend approval of any variances in particular and the subdivision as a whole, *see id.* §§ 15-9(C), -13(E). The subdivider then must submit a final plat for approval by the City Commission. *See id.* § 15-14(A). Only after the Commission approves the final plat may the subdivider begin building on its property. *See id.* § 15-14(F). Any adverse zoning decision is subject to appeal to the Planning and Zoning Commission, to the City Commission, and ultimately to state court. *See* N.M. STAT. ANN. §§ 3-21-8, 39-3-1.1; City Code § 15-9.

Plaintiffs and the City quibble over whether Plaintiffs' complaint shows that they submitted a "Master Plan" or simply a "Master Plan Concept" to the City in 2008. The confusion is understandable, since Plaintiffs' complaint never expressly says that either document was formally submitted and appears to use the terms interchangeably. (*See* Doc. 1 at 6-7, 16, 33.) Yet in either case, as the City notes, Plaintiffs do not allege in their complaint that they submitted a preliminary plat application, a variance request, or a final plat application to the appropriate entities. Nor do Plaintiffs allege that their plans have been submitted or are eligible for

submission through an alternative approval process cited in City Code § 15-13(A). By analogy to *Bateman*, then, there is no indication that a final decision has been reached or even requested as to Plaintiffs' development plans.

From the face of the complaint, the prospects for Plaintiffs' development plans remain as uncertain as those at issue in *Norvell*. Despite claiming that it is enough that Ordinance No. 633 "has been enacted" and allegedly "impairs their development plans," Plaintiffs at this point have done "no more than presently allege that if the project [proceeds as planned], it may fall within" the Ordinance's restrictions. *See Norvell*, 519 F.2d at 376. The applicability of Ordinance No. 633 to Plaintiffs' plans is contingent on (1) Plaintiffs' application for a preliminary plat featuring specifications that would appear to exceed the height requirements set forth in the Ordinance; (2) the Plaintiffs' application for a variance from those requirements; (3) the Zoning Administrator's rejection of the preliminary plat application; (4) the Planning and Zoning Commission's refusal to recommend approval of the project; (5) should the Planning and Zoning Commission eventually recommend approval, Plaintiffs' application for a final plat; (6) the City's rejection of the final plat; (7) the reliance by any of these entities on Ordinance No. 633 in rejecting the plat applications; and (8) the City's refusal to grant an application for a variance. Plaintiffs do not allege that any of these contingencies have occurred, and they also do not allege that they have utilized the special-use permitting process or that a permit application has been rejected.

This "concurrence of . . . contingent events[] necessary for injury to be realized" is, as in *Eccles* and *Coffman*, "too speculative to warrant anticipatory judicial determinations." *See Eccles*, 333 U.S. at 432. Moreover, Plaintiffs do not argue that the City is engaging in coercive behavior that has prevented them from filing a plat application or a variance request, *cf. MedImmune*, 549 U.S. at 129-36, and their allegations do not show that the City has effectively

forced them to choose between "abandoning [their] rights or risking prosecution," *id.* at 129. At most, Plaintiffs merely seek "an advisory opinion as to the validity of [a] defense to a suit" if the City were ever to deny a plat plan or variance request for failure to comply with Ordinance No. 633 and they were to ultimately seek redress in court. *Cf. Coffman*, 323 U.S. at 324.

Because any injury at this point hinges on little more than speculation and contingency, I conclude that Plaintiffs have failed to plead facts showing "a substantial controversy . . . of sufficient immediacy and reality to warrant the issuance of a declaratory judgment." *See MedImmune,* 549 U.S. at 127 (citation omitted). For the same reasons, any dispute regarding the possible preemption of Ordinance No. 633 by federal law is not yet fit for judicial decision. *See Farrell-Cooper Mining Co.*, 728 F.3d at 1234 (citation omitted). Finally, nothing in the complaint indicates that Plaintiffs would suffer substantial hardship due to the Court's failure to involve itself in their dispute with the City at this time, *see id.*, as Plaintiffs remain free to continue the zoning approval process for their development plans. Accordingly, no justiciable controversy exists between the City and Plaintiffs on this claim at this time, and thus the matter is not yet ripe for review.

Plaintiffs' arguments to the contrary are unavailing. They insist, for example, that any facts regarding the filing or nonfiling of a plat plan are outside the scope of the complaint and that, at any rate, "the requested declaratory relief would have the 'real world' effect of clarifying the legal impact of the City's ordinance in light of the relationship between the parties and existing agreements." (Doc. 33 at 10 (quotation omitted).) First, the fact that no mention of a plat application is made in the complaint is precisely the problem—it is Plaintiffs' responsibility to establish that jurisdiction exists, *see Port City Props.*, 518 F.3d at 1189, and the lack of any allegation regarding a plat application goes towards the immediacy and reality of the controversy

at hand. Second, a decision that would simply "clarify" the impact of Ordinance No. 633 if it were ever applied towards Plaintiffs' planned development is quintessentially an advisory opinion. The decision cited by Plaintiffs in conjunction with their argument, which considered whether an action to determine the validity of a statute was mooted by the statute's amendment, has no bearing on the issue at hand. (*See* Doc. 33 at 10 (citing *Citizens for Responsible Gov't State Political Action Comm. v. Davidson*, 236 F.3d 1174, 1182 (10th Cir. 2000)).)

Plaintiffs also cite to caselaw to contend that they only need to "minimally" demonstrate "'a realistic danger of sustaining a direct injury as a result of the statute's operation or enforcement.'" (*See id.* (quoting *Babbitt v. United Farm Nat'l Union*, 442 U.S. 289, 298 (1979)).) Even ignoring the conclusory nature of Plaintiffs' argument that their claim meets this standard, this citation does nothing to help Plaintiffs' position. In *Babbitt*, after observing that a party "does not have to await the consummation of threatened injury to obtain preventative relief," the Supreme Court continues, "If the injury is certainly impending, that is enough." *Babbitt*, 442 U.S. at 293 (quoting *Pennsylvania v. West Virginia*, 262 U.S. 553, 598 (1923)). Here, the certainty called for by that statement is demonstrably lacking, as Plaintiffs have yet to submit their plat application and any variance requests. Until and unless such action is taken, and until and unless that application is rejected pursuant to Ordinance No. 633 and those variance requests are rejected, any injury to Plaintiffs is by no means certain to occur.

Because no justiciable controversy currently exists between the parties as to Plaintiffs' claim for declaratory relief in Count I, this claim must be dismissed for lack of subject-matter jurisdiction.

## II.      Injunctive Relief as to Ordinance No. 633

In Count II, Plaintiffs seek injunctive preliminary and permanent injunctive relief "preventing [the City] from bringing any action under state or local law to prohibit or otherwise regulate the development of Plaintiff's [*sic*] land pursuant to Ordinance No. 633 or other local law which is preempted by federal law regarding aviation safety." (Doc. 1 at 22.) As this request for relief would be based on a finding in Count I that City Ordinance No. 633 is preempted by federal law, Plaintiffs appear to seek this relief under 28 U.S.C. § 2202, a provision of the Declaratory Judgment Act that allows for "[f]urther necessary or proper relief based on a declaratory judgment," including injunctive relief. *E.g. Powell v. McCormack*, 395 U.S. 486, 499 (1969). However, as noted previously, the Declaratory Judgment Act does not itself provide jurisdiction over claims, *see Amalgamated Sugar Co.*, 664 F.2d at 822, and I lack jurisdiction over Count I since that claim does not present a justiciable controversy. Accordingly, I also lack jurisdiction over Plaintiffs' claim for injunctive relief, and that claim must therefore be dismissed.

## III.     Uncompensated Takings

In Count III, Plaintiffs assert that the City's actions and zoning ordinances rise to the level of a regulatory taking without compensation. The City argues in response that it cannot have effected a regulatory taking since it has not yet reached a final decision on Plaintiffs' development and Plaintiffs have not sought compensation through available state procedures.

"A claim that the application of government regulations effects a taking of a property interest is not ripe until the government entity charged with implementing the regulations has reached a final decision regarding the application of the regulations to the property at issue." *Williamson Cnty. Reg'l Planning Comm'n*, 473 U.S. at 186. Plaintiffs claim that "the City,

though its actions in enacting [O]rdinances 574 and 633, ha[s] had the effect of a final decision from the City." (Doc. 33 at 16.) However, as discussed with respect to Count I, the complaint does not allege that the City has taken any affirmative enforcement action against Plaintiffs or their development under the Ordinances in question, and the complaint does not state that Plaintiffs have submitted a plat application for the City to act upon under those Ordinances or a request for a variance. *See Bateman*, 89 F.3d at 706-07. "[A]ny zoning action regarding [Plaintiffs'] property cannot be final until [Plaintiffs] seek[] a determination from the [City], as only then will the [City] have had the opportunity to decide whether [Plaintiffs] enjoy[] a valid nonconforming use, or whether some other legitimate justification for granting a variance exists." *Id.* at 706. Simply put, it would be inconsistent with Supreme Court and Tenth Circuit caselaw to accept Plaintiffs' argument that the passing of an ordinance constitutes the same thing as "reach[ing] a final decision regarding the application of the [ordinance]" to their Property.

Plaintiffs cite *Los Alamos Study Group v. U.S. Department of Energy* to argue that the City's actions thus far constitute a final decision on their Property. (Doc. 33 at 16 (citing 692 F.3d 1057 (10th Cir. 2012)).) In that action for declaratory and injunctive relief, the plaintiff sought a finding that changes to its facility construction plans were significant enough to warrant a new environmental analysis and to halt construction until that analysis had been completed. *Los Alamos Study Grp.*, 692 F.3d at 1060. The Tenth Circuit concluded that the case was not ripe for review, as the plaintiff had not identified any actions that would irreversibly lead to the construction of the planned facility, even though some construction had already been completed. *See id.* at 1065-68. Though the facts of the case are largely inapposite, it is telling that the court concluded that the defendant agencies' actions did not "mark the consummation of [their] decisionmaking process" and were not actions "by which rights or obligations ha[d] been

18

determined, or from which legal consequences w[ould] flow." *See id.* at 1065 (quoting *Bennett v. Spear*, 520 U.S. 154, 177-78 (1997)). Similarly, the mere passage of the Ordinances in question does not "mark the consummation of [the City's] decisionmaking process" or constitute a determination of rights, obligations, or legal consequences as between the parties with respect to Plaintiffs' development. As in *Los Alamos Study Group*, Plaintiffs' complaint suggests that the decisionmaking process here either has not commenced or is ongoing and that the City has not yet had a chance to fully evaluate the applicability of its Ordinances to Plaintiffs' project. *Cf. id.*

Moreover, even if the allegations in Plaintiffs' complaint could somehow be read as showing that a final decision has been reached with respect to the Ordinances or other actions by the City, nothing in the complaint shows that Plaintiffs have unsuccessfully "s[ought] compensation through the procedures the State has provided for doing so," a requirement for any regulatory takings claim. *See Williamson Cnty. Reg'l Planning Comm'n*, 473 U.S. at 195. Plaintiffs effectively concede this point by admitting that they have brought Count IV, a claim of inverse condemnation under state law, "in the alternative to their takings claim in order to meet the requirement that they seek just compensation through the available state procedures." (Doc. 33 at 16.) In other words, in addition to pleading Count IV as an alternative to the instant claim, Plaintiffs also assert that they satisfy an element of this takings claim simply by bringing the inverse condemnation claim.

Even assuming that New Mexico's inverse condemnation procedure constitutes "an adequate procedure for seeking just compensation" in this case, "[a] property owner cannot claim a violation of the Just Compensation Clause until it has used the procedure *and been denied just compensation*." *See Bateman*, 89 F.3d at 708 (quoting *Williamson Cnty. Reg'l Planning Comm'n*, 473 U.S. at 195) (emphasis added); *see also Wilkinson v. Pitkin Cnty. Bd. of Cnty.*

*Comm'rs*, 142 F.3d 1319, 1323 (10th Cir. 1998) ("[W]hether an unconstitutionally improper taking occurred cannot be determined until both the taking and the compensation have been legally evaluated."). Nothing on the face of the complaint shows that Plaintiffs have utilized New Mexico's inverse condemnation procedure and been denied just compensation. At most, the complaint only shows that they are attempting to use that procedure now and are awaiting an adverse ruling on the claim. This will not do. *See Miller v. Campbell Cnty.*, 945 F.2d 348, 352 (10th Cir. 1991). Moreover, even failure as to Count IV at this stage would not likely suffice to render this takings claim ripe. *See Mid Gulf, Inc. v. Bishop*, 792 F. Supp. 1205, 1215-16 (D. Kan. 1992).

Given that Plaintiffs cannot show that a final decision has been reached as to the applicability of the Ordinances to its development and that Plaintiffs have not shown that they have sought compensation for any purported takings through state procedures, Plaintiffs' regulatory takings claim is not ripe for judicial review. Accordingly, Count III must be dismissed for lack of jurisdiction.

## IV.    Questions of State Law

The remaining claims all implicate questions of state law. Count IV, an inverse condemnation claim, alleges that the City's enactment of Ordinance Nos. 574 and 633 constitutes a taking of Plaintiffs' Property and requires just compensation under state law. Count V seeks a declaratory judgment that the City collected and retained the $200,000 Option Agreement deposit from Plaintiffs in violation of state and local law. Counts VI and VII seek damages and equitable relief, respectively, for the City's alleged breach of the Option

Agreement. Counts VIII and IX[4] seek damages for the City's alleged breach of the ADA and the water well agreement, respectively. Finally, Count X accuses the City of breaching an implied covenant of good faith and fair dealing in its interactions with Plaintiffs. Plaintiffs assert that "pendent jurisdiction"—that is, supplemental jurisdiction—exists over these claims.[5]

A federal court may exercise supplemental jurisdiction over state-law claims, but only if those claims are related to a claim over which the court possesses original jurisdiction. 28 U.S.C. § 1367.[6] In this case, even assuming that Plaintiffs' state-law claims are sufficiently related to the asserted federal claims, jurisdiction is lacking. Only Counts I, II, and III purport to invoke the original jurisdiction of this Court, and I have dismissed those claims under Rule 12(b)(1) for lack of subject-matter jurisdiction. "Since a court must have original jurisdiction in order to exercise supplemental jurisdiction, a dismissal [of all asserted federal claims] pursuant to Rule 12(b)(1) precludes a district court from exercising supplemental jurisdiction over related state claims." *Estate of Harshman v. Jackson Hole Mountain Resort Corp.*, 379 F.3d 1161, 1166-67 (10th Cir. 2004) (quoting *Nowak v. Ironworkers Local 6 Pension Fund*, 81 F.3d 1182, 1188 (2d Cir. 1996)). Though Plaintiffs argue that I retain discretion to exercise supplemental jurisdiction over their state-law claims under 28 U.S.C. § 1367(c), that exception cannot apply here since there never were any federal claims over which I could exercise jurisdiction to begin with. *See id.* at 1167 & n.3 (citation omitted). "[I]f there be no federal subject matter jurisdiction, it follows that

---

[4] The complaint lists these two claims under distinct sections that are both labeled "Count VIII." For the sake of clarity, I renumber the second Count VIII and the original Count IX as Counts IX and X, respectively.

[5] Though Count V is brought pursuant to the Declaratory Judgment Act, 28 U.S.C. § 2201, I have previously noted that this statute does not itself provide a grant of federal jurisdiction, *see Amalgamated Sugar Co.*, 664 F.2d at 822.

[6] Indeed, the federal claims and state claims must be more than merely "related" for a federal court to exercise supplemental jurisdiction over the latter; the state-law claims must be "so related to claims in the action within [the court's] original jurisdiction that they form part of the same case or controversy under Article III." 28 U.S.C. § 1367(a).

there is nothing to which to append state claims—in a pendent jurisdictional sense zero under 12(b)(1) is absolute zero." *Id.* at 1168.

In the absence of any federal claims over which I may exercise subject-matter jurisdiction, supplemental jurisdiction over Plaintiffs' state-law claims cannot be sustained. Accordingly, Counts IV, V VI, VII, VIII, IX, and X must be dismissed without prejudice.

## V.      Leave to Amend

Plaintiffs request permission for leave to amend their complaint if their jurisdictional allegations are deficient. "Defective allegations of jurisdiction may be amended, upon terms, in the trial or appellate courts," 28 U.S.C. § 1653, and as a general rule leave to amend should be freely given, *see* FED. R. CIV. P. 15(a)(2). The City does not address Plaintiffs' request to amend in its reply.

The instant motion was presented as a facial attack on subject-matter jurisdiction rather than a factual attack, and as such I have only considered the allegations in Plaintiffs' complaint and not the actual material facts of this case. Of course, if sufficient facts do not actually exist to show that Plaintiffs' federal claims were, in fact, justiciable controversies that are ripe for review, then amendment under § 1653 would not suffice to render those claims justiciable. *See Newman-Green, Inc. v. Alfonzo-Larrain*, 490 U.S. 826, 830-31 (1989) (construing 28 U.S.C. § 1653).[7] However, if such facts exist and Plaintiffs have simply failed to plead them, then I see no reason why Plaintiffs should not be allowed an opportunity to amend their complaint so as to address their "[d]efective allegations of jurisdiction." *See* 28 U.S.C. § 1653. Given the facial

---

[7] I recognize that the City attached to their reply brief an affidavit from Bill Slettom, Assistant City Manager, averring that Plaintiffs have not submitted the appropriate plat applications. However, because the motion under consideration constitutes a facial challenge to Plaintiffs' complaint, I have not considered that assertion in reaching my decision today.

nature of the City's attack, I will give Plaintiffs the benefit of the doubt and allow them fourteen days to file an amended complaint that corrects any defective allegations of jurisdiction.

### CONCLUSION

Plaintiffs have failed to allege sufficient facts showing that their federal claims present a justiciable controversy at this time, and as such, subject-matter jurisdiction over those claims is lacking. Moreover, the absence of any jurisdiction over those federal claims deprives me of jurisdiction over Plaintiffs' state-law claims as well. As such, the City's motion to dismiss (Doc. 25) is GRANTED, and all of Plaintiffs' claims are dismissed without prejudice. However, Plaintiffs are granted permission to file an amended complaint curing any defective allegations of jurisdiction within **fourteen days** of the filing of this Memorandum Opinion and Order. Final judgment will issue if no amended complaint is filed before that time.

IT IS SO ORDERED.

William P. Lynch
United States Magistrate Judge

A true copy of this order was served
on the date of entry--via mail or electronic
means--to counsel of record and any pro se
party as they are shown on the Court's docket.